Judge Davis. Good morning, may it please the court. My name is Tom Pluffjohn. I'm from Loudoun County, Virginia, and I represent the Fialdini's, Andrew and Marianne Fialdini, in this matter. Before I begin, I'd like to emphasize in the case that we are asking the court to make a decision with regard to two people's separate claims that were actually joined at the district court level. So they're not seeking judgation of joint claims, but they're individual claims. And the ultimate issues in this case, obviously because the case was dismissed on summary judgment, is whether there were sufficient facts shown beyond the pleadings that would say that there were actual controversy in place that would have allowed this case and should have allowed this case to go to trial. Before you get going, let me ask you a couple of housekeeping questions. The detective or officer testified that before he went out the day that the arrest was made, December 29th of 2009, he checked the address to confirm that it was still the address listed for the son. Is that print out or was there print out? Is that in the record anywhere? It is not, and that's one of the issues that we had, Your Honor. Okay, it was printed out later on. Printed on later on, and it was not admitted in the record. Okay, I just wanted to make sure. And one other question. Are the arrest warrants for Andrew in the record? They are not, Your Honor. Okay, that's fine. Now you can go on with your argument. I just wanted to clear those things up. Thank you. The first issue in terms of the – I broke it down into a series of different areas, but the first area I'd like to talk about is the entry into the home by Officer Cody. And I'd like to bring the court's attention obviously to what I call the triumvirate of the cases that were available to the district court at that time. Payton back in 1980, Wallace by this court in 1980, and Stiegel back in 1981. And what those cases did is they established a two-prong analysis as to whether if there is a warrant, if there is an attempt to enter into a third party's residence, what are the issues or what is the threshold questions that have to be answered by the officer? And I believe this is clearly established law, and the officer was charged with knowing that. And those issues are was there reasonable belief that someone was present inside, and whether it was – we've referred to it in the brief as whether it was someone's residence. Those cases actually refer to did the subject live there at the time. Now, the difficulty that we have with the summary judgment motion is that in making the decision, the district court did not apply that standard. The district court applied a standard of Judge Payne's opinion in Smith v. Tolley, which is a very fine opinion, but the facts are very significantly different in Smith v. Tolley. And what the court – what the district court actually said, because we argued there was a two-step analysis that had to be taking place and that there were issues of dispute with that two-step analysis, as we identified on 19 and 20 of our appellant's brief, it says, I know the plaintiff has argued extensively that what the officer was missing in this case was knowledge that Nicholas Fialdini was a resident of the house. The word residence is emphasized so much. Residence is not the absolute requirement. If the officer has reason to believe the person for whom the warrant has been issued is present in the home at that time, he's authorized to go in, and that's what we have here. That legal analysis is directly contrary to the holdings of Stiegold and Wallace in this case, that says that if this is a third person's – if this is a third party's home, you need an arrest – you need a search warrant, and you can go in if it is the resident and the second standard is you have reason to believe someone is there. And when she – the district court relied on Smith v. Talley, and we argue that that's just – it not only is the district court, so it's not – it may be used for persuasiveness, but it's not binding, but more importantly, in that opinion, Judge Payne says, it is undisputed that Booth and Linda Smith resided together at the address. Are you conceding that the district court got the second part of that analysis correct, reason to believe that Andrew was there at the time? Well, I don't believe factually the court got it, but legally I believe they got it correct. The rule of law was stated correctly? The rule of law is there's a two-prong analysis. Yes, sir, Judge Diaz. The first is, is there reason to believe that someone is present in the property, and is it someplace where they live? Right. Okay. So with respect to that first prong, you dispute the facts according to that. You dispute both. Well, I dispute the facts that gave the district court the reason to grant the summary judgment motion on that one prong, but the problem is she had to examine both prongs, and without doing that, we have, I believe, an invalid summary judgment determination. I'm sorry. I'm not following. Do you allege it was error to conclude as a matter of law that there was sufficient reason to believe he was there? Absolutely. It was error to make that conclusion. And why? Because as we identified in the appendix, and I'm citing 236 to 238, as well as 35 to 34 of our brief, Officer Cody acknowledged that when he came to the house, he did not know who was in the house. He didn't know. But the behavior of the parent, how do you get around that? Well, first of all, Judge Davis, and that's one of the difficulties we have, that behavior is in dispute. That's Officer Cody, who doesn't mention any behavior at the preliminary hearing in Loudon Circuit Court, mentions behavior at the summary judgment hearing in the district court, and Andrew Fialdini denies that behavior. And he denied it on the record. There's no allegation. As a matter of fact, Andrew Fialdini said that Officer Cody was irate, not that he was irate. He doesn't say he told them he's not there. My client doesn't have to tell them he's not there. I beg to differ. If the legal question, if I'm understanding what went on here, officer shows up for the second time, believing the kid lives there. I'll refer to him as a kid, with no disrespect. The young man lives there. He testifies under oath that he said to the dad, I'm here to arrest your son. You know, I'm here for the second time. Remember, I was here in October, and you told me he comes home for the holiday from Alabama, etc. That's pretty compelling evidence. Now, you say your client simply says, no, none of that happened. But your client doesn't say, I told him he wasn't here. And you say, well, my client didn't have to say he wasn't here. What I also say, and it was spun in the record, is my client indicates he didn't know if he was in the home at the time. That's one of the things he said. He didn't know. He didn't know if he was in the home, because he came home and hadn't seen his son. He admitted in deposition that he was visiting, but it's not whether you're visiting. Two cars were parked out front. His. Mr. Fialdini's car. Not his son's car. So all those cars out there, none? There were two cars. Actually, we don't know from the record how many, but we do know that Officer Cody said I asked him very specifically whose cars were there. He says, I don't know whose cars were there. I don't know if it's Nick Fialdini's car or the mother or a neighbor or a friend. Okay. So I'll let you go on with your argument. But now it sounds like you're arguing that this appeal shouldn't even be here, because there were disputes of material fact and the judge should have concluded. That's what we've been arguing in our brief, I think, very extensively, is that the appeal shouldn't, because there are material facts that are in dispute. There are material facts in dispute. And when Officer Cody says, I don't know whose cars they are. I didn't see anyone in or out. I didn't know, when I approached the house, I didn't know if there was anyone inside the residence. I was just ringing to see if someone came to the door. How can you draw a conclusion that Nicholas Fialdini is in the residence? And that's what the conclusion he has to draw. That's fine, but the dad denied that he was there. No, he didn't. No, who didn't do what? Officer Cody didn't deny that the dad said he was there. No, no. Officer Cody says the dad told me he wasn't there. No, Your Honor. I don't believe he says that. Okay. I think what he indicates is that Mr. Fialdini, when I asked, Mr. Fialdini pled the fifth. Right. Okay. Now, to my mind, that's saying, yeah, the kid's in here. Yeah, he's here. But I'm not going to tell you he's in here. Well, that actually, I think that goes to a leap that I think is not available to the officer. Now, in terms of that, that's what Officer Cody said he pled the fifth. I don't believe the record establishes that Andrew Fialdini said he pled the fifth. Well, what does he say that contradicts? Between the time the officer gets there. Yes, sir. And the officer goes in the house. What does your client contradict with regard to what Officer Cody says happened? Mr. Fialdini says, I asked him if he had a search warrant. When he said no, he says, I'm going to go call my attorney. And then he turns around and enters his home. And that's it? Yes. And that's the only contradiction? That was the only statement. And he said he was very agitated. And that's when the officer puts his foot in the door and says, I'm coming in. Okay. And under those circumstances, that's a disputed fact. It is a disputed fact, but is it material and is it sufficient to support a claim of an unconstitutional search? Well, one of the difficulties I have is that I think that the officer has to establish that he had a reasonable basis to believe that not that there was something suspicious going on, but that Nicholas Fialdini was inside the home. I know, but he says the father came to the door, opened the door only sufficiently to allow him to get out, that he edges out the door, he claims the theft. I gave the example to the district court. And that's uncontradicted? Well, but I gave the example to this. The officer had an inkling that maybe something was going on, but not that Nicholas Fialdini was there. The example I gave to – What else could be going on? Well, this is the example I gave the district court. It could be that he was rolling joints on his dining room table. Well, you could all imagine. Well, but that's the problem is I don't know of any constitutional prerogative that says an officer gets to interpret someone's exercising their right. I don't want you coming into my house. I have a Fourth Amendment right that you can't come without a search warrant. Well, you asserted that kind of squishy, so I get to ignore that. I'm not aware of that thing. But officers do that all the time. You're right. They violate the law all the time. Officers encounter suspicious circumstances that could give rise to hypothetically five different crimes, but also could be totally innocent circumstances. The qualified immunity analysis says the officer will not be punished for a wrong guess in those circumstances. So if you have circumstances in which there's a possibility of five different crimes being committed or no crime, and all of those possibilities are equal, that's the meaning of probable cause. Well, the problem, Judge Davis, is that you – Tell me what the problem is. The problem with it is you can't take it out of the context of this is the sacrosanct crossing the threshold of a home. I get that. I get that. But the question is not whether they have a right to search the home for marijuana. The question is, is there a reasonable belief that a person for whom you have an arrest warrant is hiding out in the house?  That's exactly the question. The law says, is there a reasonable belief they're in the house and it's where they live. I'm going to that. And where they live. Ten minutes ago, I tried to get you to talk about what you call the first prong. I haven't gone to the Seagal-Payton question. This has all been about whether it was reasonable for the officer to come to the conclusion, not by a preponderance of the evidence. That's not the standard. Whether it was reasonable for the officer to believe, based on his interactions at the door and his prior interactions, that the young man was in the house. And you started out by saying, no, there's a factual dispute about that. And Judge Traxler followed up and said, well, where's the dispute? We're still talking about that prong. And if we're still talking about the prong, I guess because you raised the issue of qualified immunity. Well, of course. And I want to address that. Qualified immunity does not apply if there's a violation of clearly established law. And I don't think that you can divorce this circumstance. I'm at the threshold of someone's home. And to say that I have, even if I have a reasonable belief that that person's inside, Payton has been around for 35 years. And that's fine. That's fine. And maybe I shouldn't have taken you down this path to talk about it. I thought your answer was going to be pretty straightforward and easy, frankly. I didn't think we'd spend 10 minutes on whether there was reasonable belief that he was in there. I thought you really wanted to talk about the other thing. I did, Your Honor, and I was answering questions. I don't think there's reasonable belief that he was in just because someone is nervous or hesitant about talking to an officer. But more importantly, it's a two-prong test. And there is evidence in the record that his residence was in Alabama and it had been changed in August of 2009. And so, therefore, that's an evidentiary issue that has to be decided by the trier of fact. No, it doesn't. Because you're going to look at those questions from what the officer knew. What facts did he have in his mind? What was he aware of when he took the action he did? So, if something were changed in Alabama, unless you can establish the officer knew it, you know. Well, Your Honor, I think, and I agree with it, but I think that's for the trier of fact because what we had and what we explained to the district court. It's just a trier of fact that there's no evidence of. That's what I was saying. We explained to the district court was that we have Nick Fialdini's changing of his license and that he not only got a temporary license in August, but he got a permanent license in September that changed his residence in Virginia. And that the officer's statement that he looked at, one time he said he looked at DMV, the other time he said he looked at BCIN, but this alleged piece of paper from the 29th that's never been admitted anywhere is false. But that's pure speculation. It seems to me that if your version of what happened is true, you would have someone from the department that runs driver's licenses to say that when this happened in Alabama, it caused this change. At trial, we would. Why would I do that? You've got to get past some of the judgment. But we've alleged facts and we have the sworn, all they have is Cody's sworn statement that this was the case, and they have Mr. Fialdini's sworn statement that says, no, he changed the license, and it doesn't reflect that. Speculation. You've got evidence on one hand, speculation on the other. With due respect, I don't see it as evidence from Cody because he doesn't offer the document. He's given a sworn statement. So has Fialdini. He's speculating. Well, actually, no. He says, I have the license that changed it. So if he has the license, it's a sworn statement. It doesn't mean that it was the evidence given, that the officer check was changed. Anyway, you're out of time. I'm out of time on this one. Thank you, Your Honor. Thank you for your reply. Let me hear from the appellate. May it please the Court. Your Honors, I'm Alex Frankeczak. I represent the law enforcement defendants in this case. And, Judge, just to clarify one of your original questions, the testimony, which is not in any way rebutted by any acceptable evidence, is that Deputy Cody did two checks. One prior to the October 19th attempt to serve the warrant. Second, prior to the December 23rd attempt to serve the warrant. That is the unrebutted testimony in this case. It's in this deposition, and it's clear that he stated that. The issue about printing it out came up. He attempted to print it out subsequently. And that was what he testified to at trial. All I'm saying was he just looked at the screen the first time. He looked at the screen. But didn't print it out. Exactly. It wasn't an issue at the time because, at that point, he's just gathering information. He's not preparing for a civil case. He's not preparing, at that point, to deal with an issue that may have come up at the preliminary hearing. So, subsequently, he goes back and prints it out. If you don't mind, let me check my understanding of the appellant's contention in that regard. Do I understand the contention to be that the second check, if the credibility of the testimony regarding the second check is undermined by sworn testimony that the privilege to operate a motor vehicle was transferred from Virginia to Alabama sometime prior, and, therefore, if the officer had actually checked in December, although it seems like the same would be true in October, if the officer had actually checked in December, the officer would have discovered this. All I'm asking is, is that your understanding of the argument? That's the argument, yes, Your Honor. But there's been no evidence which would support that, somehow, in Virginia, that the DMV wouldn't still list him at the Ashburn or Virginia address, which is what my client, Deputy, testified to. Their argument is it couldn't have been on the screen because he took steps in Alabama. First of all, Nicholas Fialdini, as far as this case is concerned, never gave a deposition. There's no affidavit testimony. All this information that this argument is based on is from Dad. So, yes, Your Honor, that's the argument, but, again... Which means it's not even admissible. It's not admissible. You're right. And their argument is, well, you're relying on Cody's sworn testimony. Well, yeah. That's what we're relying on because Cody was the one that took the steps before going to serve the warrant both times. Cody was the one that was relying on information from Dad and Mom that a son was in Alabama, that he was coming home at Thanksgiving. There was a level of expectation that at Thanksgiving they would have walked him in. We're talking about sophisticated plaintiffs here. We're not talking about folks that are in the intelligence community, that work for the Department of Defense, who may not have been law enforcement but pretty darn close, worked with law enforcement. So you would have figured, hey, my son stole something from Nordstrom, so let me get this worked out. Instead, he's pleading the Fifth. I mean, come on. Then you have the whole issue about the assault. There's no question about that, that there was contact between Mr. Fialdini and Deputy Cody at the door. And they have explanations for it, but the reality of it is there was contact. Even Mr. Fialdini testified that there was a jolt to the chest. So when you're looking at the malicious prosecution claims, there certainly was enough probable cause for them to at least bring those charges. In fact, there was a full-blown, and you have this as part of your record, a full-blown preliminary hearing with evidence where Andrew Fialdini testified, Mary Ann Fialdini testified, and they brought Nicholas Fialdini all the way up from Alabama to testify at that prelim hearing. Let me ask you about the rest of the why from the prosecution of the why. Yes, sir. Why doesn't, why isn't there a genuine issue, material fact, with regard to whether or not the circumstances justified her arrest? Your Honor, I think, first of all, she was charged under an ordinance, not a state statute. It was a hindering ordinance. The evidence in that regard is undisputed. She knew that her son was home from Alabama. She knew that when she saw the police there. She knew that they were attempting to serve the arrest warrant. That was crystal clear. Go ahead. She knew that when the kids came up from the basement that the son was most likely in the house because one of the son's friends was there. The only reason he would have been there would have been if the son was there. She followed these officers down into the basement where you have a, I would say, a fairly tense situation when you've got one officer going through. What's the hindrance? Well, Your Honor, when you have a backup officer that's asking you to back off and then you get within three feet of that officer and you're not backing up, and that's undisputed. No, no. That'd have to be a command to back up. Well, Your Honor, there was. Okay. Is that where the hindrance is? Yes, Your Honor. All right. That she was commanded to back up and she didn't. That's right, Your Honor. Did she admit she was commanded to back up and didn't? She admits to one command, and, Your Honor, there is undisputed fact that there was at least one command. Our side of it was there was more than one command. There were several, but. She admits that she did not obey the order. That she got to within three feet of them. Yes, Your Honor. No, did she admit or refuse to obey the order? Well, by her actions, she refused. What page is that on, on the JA? In terms of where she was? Where she admits. She doesn't. Of course she's not going to admit that. She does not affirmatively admit. Well, okay, go ahead. Your Honor, my argument is that by her actions, she is not following the order. So does she deny receiving that command? She admits that there was. She admits there was one command, Judge. Does she deny disobeying the command? I don't think that there was ever a request for admission or there's any testimony from her that she did not obey commands. So you say the record is devoid of any statement, sworn statement, deposition testimony from her denying the facts as recited by the officer. She denies that there was three commands. She concedes there was at least one. But she does not either admit or deny that I can recall in this record specifically take a position admitting or denying that she did not follow a command. All right, go ahead. And I'm looking at her actions, Your Honor, the actions of her following these folks down into the basement, the law enforcement into the basement, the actions of, at that point, knowing that there is a highly likely possibility that he's in the basement and not telling them. That, Your Honor, that action, that failure, could be considered a hindrance to their investigation because at that point you've got officers that are, I would argue, Your Honor, in danger because they're going into areas that are behind dry walls that ultimately Mr. Fialdini, Jr., the kid as been described by the judge earlier, was found behind a dry wall. I mean, we're lucky no one got shot in those circumstances. I mean, if he had something in his hands or, at this point, weapons are drawn. The testimony from Sanford, who was the one who actually, the supervisor on scene, was that at one point she had weapons drawn. She asked Mrs. Fialdini to back up. According to Sergeant Sanford, she made repeated requests which were denied. But because she didn't have a weapon, she holstered her own gun and pulled out her taser. That's in the record. So she realized that the force at that point, dealing with Mrs. Fialdini, was not a deadly situation. But she still had her deputy poking around a dark closet. And, Your Honor, if you're going to say that somebody else distracting these folks can't be at least reasonably perceived as a hindrance, I simply would disagree with the court. This is a law enforcement situation where the plaintiffs knew or should have known their son was in the house. They knew he was home from Alabama. They took steps to cover it up. The father is pleading the fifth when he has no Fifth Amendment right at that point because, you know, at that point he hasn't committed a crime unless he perceived harboring somebody that there was an arrest or war as a potential crime. And maybe that is a potential crime, but they weren't charged with those potential crimes. But, Your Honor, I think that the district court in this case had ample undisputed material facts on each point, on each count, in order to sustain the summary judgment based on qualified immunity. And qualified immunity is out there. The principle is out there to protect law enforcement officers who are trying to do their job in a reasonable manner and doing the best that they can under the circumstances. I take it you, I won't use the word conceive, but the district court's articulation of what we'll call the first prong of the entry issue. I mean, what do you say about that? Do you agree, if you don't conceive, that that could have been articulated in a more precise manner? I believe it could have been articulated, but I think she still got the law right in terms of applying the law to the undisputed material facts in this case. The court didn't issue a written opinion. The court did rule from the bench. There were a couple of points during, and I went back and read. How do you put on the rocket dock if the written opinions are already done and they can read them from the bench? I think it depends on the judge, Your Honor. It depends on the judge. But I don't think she incorrectly applied the law to the undisputed material facts in this case, so I don't conceive that point. If she misstated or misspoke, I don't think it is a reversible error for this court to send back to have her rearticulate something on the record or in a written opinion. But going back to the principles of qualified immunity and why we have them here, this is the type of case where immunity is appropriate. There was no violation of constitutional rights by any of the officers in this case, and I believe that there were no material facts that were in dispute upon which the judge should have let this thing go to a jury or for this court to send it back to the trial level. Unless the court has any further questions. Thank you. Thank you. I asked your opponent about the testimony of the wife in this case and what she said happened. I'm looking at, I'm on page 217, 218 of her deposition. That's where I am as well. But reading it, she never says, unless I'm missing something, that I did what they told me to do, I stood where they told me to stand, I did nothing in contravention of their instructions. She does say, they asked, were you just watching? I was just watching on page 218. They were swinging around to the finished portion, and I turned on, I walked over and turned on the light switch. There's no, she doesn't acknowledge any command made at that point in time. But she did, on page 218 she does. They said, you're too close, you know, back up, or something along those lines. No, she says, and I said, I'm sorry, I'm sorry. It doesn't say who said that. I apologize. It doesn't say who said that. No, it doesn't say, and I said, I think that's wrong. Well, Your Honor, I'm. You wouldn't be telling them, you're too close, you need to back up. This is what the transcript says, and then she, I was just watching, and then on 218, other than them saying to go back up at one point, did they give you any other instructions? No. Did they tell you to go upstairs? No. The top of page 37, who do you say is saying those words? Under the transcript, it says that she says, I said this. Now, that's what we have in terms of the record, and I don't know what you're too close or something, and before this, you have to remember, she was telling them that they didn't have permission to be in her house and that they had to leave. That's one of the things. She also indicates that she was given no commands of which, and no other instructions in this case. And then if you go to 240, I think it's 247, I just had it, with Officer Sanford. Officer Sanford indicates that she gave her a command to stop. She stopped, and then I told her to lay over the couch, and she laid over the couch, and she followed all of those instructions. Did she ever submit an affidavit in this case? No, just those, Your Honor. I wanted to go back, if I could, because the issue was raised as to what was Officer Cody's knowledge and what was his reasonable expectation. We quoted on page 284 of the – in page 43 of our brief, but 284 of the transcript. The question was, at the time he comes to the house, you didn't even know if he was there, and you didn't know how long his winter break from school was, and you didn't even know if it had begun or ended. So you really don't have that as a reason, do you? He says, no. No, I don't. I don't even know if Nick Fialdini is in the area at this point. Then on page 277. Okay, and how does that help you? Because the officer has no reasonable basis to believe that Nick Fialdini is in the house. That's not what that means. I'm sorry, but you just are looking at it. That is not what that means. He said, I'm coming to the house. I have no reason to believe he's in the house. You have three questions in there. Did you know he was there? Did you know how long his break was? And you didn't know if the break had begun or ended. That doesn't go to whether, at the moment he's there interacting with the dad, he has reason to believe that he's in the house. Judge Davis, let me, because this is part of it, where I'm now on page 277. Okay. All right? And what indication had you been given that Mr. Fialdini, meaning Nick Fialdini, this is the bottom of 276, was allegedly in the house at this point in time? Mr. Fialdini, my observations of him and his statements and his actions, contrary to my previous contact with him. What about his actions specifically said that Nicholas Fialdini was in the house and not that there was another reason why he didn't want you in the house? Nothing specifically. So all you really had was an indication he didn't want you to come into the house. Is that correct? No. Well, what else did you have? I have my observations of his demeanor. What did you observe about him that indicated Nicholas Fialdini was in the house? Nothing specifically that Nicholas was in the house. So then you had no specific indicators to suggest Nicholas was in the house, only that Mr. Fialdini didn't want you in his house. Is that correct? No specific indicators, correct. And then I asked, there was nothing that prevented you at this point in time from backing off and getting a search warrant if you had a hunch that he was in the house, correct? And he says, correct. So I have the officer's sworn testimony that he had no indication that Nicholas Fialdini was in the house and nothing from the behavior of Mr. Fialdini that specifically pointed to Nicholas Fialdini being in the house. I don't see how that doesn't become an issue for the trier of fact when the officer's own statements say that he has no indication that Nicholas Fialdini is in the house. My argument is that they should have called the SWAT team, seized this house, because they could seize the house while they went and got a warrant. And chances are, they could have actually sent officers in to seize the house rather than simply surround it. I mean, the law is very clear. These officers don't have to sit up out there on the possibility that somebody with a 20-20 carbine up on the second floor is doing what all too often happens in these situations. Your Honor, that's not what I'm suggesting. Your case comes down to he should have gone to get a search warrant while seizing the house for a shoplifting warrant. Your Honor, the issue is you can't go into a house and the officer clearly identifies he has no reason to believe he's in the house. And if we're going to uphold Payton, Wallace, and Stiegold and it's clearly established law and the officer admits he has no reason to go into the house, then yes, the action for an officer is to go get a search warrant. Not sit up there, not create some massive shooting or anything like that. You don't deny that they could have seized the house while they went and got a search warrant, right? They could have stopped anyone from leaving or exiting. That's correct. Do you deny that they could have actually gone in? I do deny they could have gone in to secure the property. You think under these circumstances they could not have gone in, gathered everybody in the living room to make sure that they were at risk while they held this house secure. Is that your submission? It is, Judge Davis, because they have no reason to believe that there's anybody in the house. If they had seen somebody go into the house, if they had followed somebody or that they had a call or they had something and at that point they had a reasonably... The only person they know in the house at this point is Andrew Fialdini because he comes to the door. So you want to read the October transaction entirely out of this case, right? Not at all. What did the October transaction say? He doesn't live here, is what it said. Did it not? I'm judging from your expressions, you don't read it that way, but that's what he said. He moved to Alabama and he'll visit at Thanksgiving. The only other issue, and I know we've gone on questions, is there are also issues of Mary Ann Fialdini's strip search. There's no reason why that should not have gone to a trial because there was evidence that she indicated that she was searched by a sheriff's deputy and that Sheriff Simpson would have been responsible for that action. And she alleges under oath that she was improperly strip searched and that Andrew Fialdini indicates that the named defendants were complicit with it, but even if they weren't complicit with it, Sheriff Simpson is a named defendant and he's responsible for the actions of his deputy. And she said, I can describe the woman, but we don't have her name, but Sheriff Simpson would still be liable for it. And I don't know why that should not have gone to a jury in this particular case. I understand that we're out of time. Thank you for your time this morning.
judges: William B. Traxler, Jr., Albert Diaz, Andre M. Davis